**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
BEVERLY A. BAKEIR,                          )
                                                    )
                        Plaintiff,              )
                                                    )
            v.                                      )        Civil Action No. 09-2202 (RBW)
                                                    )
CAPITAL CITY                                   )
MORTGAGE CORP., et al.,                    )
                                                    )
                                                    )
                        Defendants.          )
_____ )

**MEMORANDUM OPINION**

When the trial of this case eventually commenced on January 9, 2012, the claims that

remained were the following: Count I (a claim under the District of Columbia Consumer

Protection Procedures Act ("Consumer Protections Act"), D.C. Code § 28-3904 (2013)); Count

II (a claim under the District of Columbia usury laws, D.C. Code § 28-3312 (2013)); Count III

(Breach of Contract); Count IV (Fraud); Count V (Fraudulent Inducement); Count VI (Civil

Conspiracy to Commit Fraud); Count XIII (Unjust Enrichment); and Count XIV (Intentional

Infliction of Emotional Distress).[1]  A bench trial addressing these claims was conducted over the

plaintiff's objection,[2] and the presentation of the evidence concluded on January 12, 2012.  The

parties then submitted their proposed findings of fact and conclusions of law on May 23 and 25,

---

[1] The remaining Counts of the Plaintiff's First Amended Complaint were dismissed and several forms of damages identified in the plaintiff's Pretrial Statement were stricken in an Order issued on December 28, 2011.

[2] The plaintiff's demand for a jury trial was denied by the Court based on the finding that the plaintiff had waived her right to a jury trial when she executed the loan agreement that is the subject of this case.  The plaintiff argued that she should not be bound by the waiver because of the defendants' breach of the loan agreement, and the Court responded that it would reconsider whether the plaintiff should be afforded a jury trial as to the damages she is requesting if the Court found that the loan agreement had been breached by the defendants and breached in a manner that voided the jury trial waiver, determinations the Court concluded it could not make without hearing the evidence concerning the alleged breach by the defendants.  Having now heard the evidence, the Court affirms its prior ruling that the plaintiff did waive her right to a jury trial and that there is no basis for voiding that decision.

2012, and the plaintiff submitted a reply to the defendants' submission on June 13, 2012 ("Pl.'s Reply").[3]  What follows are the Court's factual findings and legal conclusions.

## I. FACTUAL FINDINGS

The property that is the subject of the dispute in this case is a two unit condominium located at 509 O Street, N.W., and referred to by the parties as Units A and B.  Plaintiff's Exhibit ("Pl.'s Ex.") D-21 (Deed of Trust) at 2; Defendants' Exhibit ("Defs.' Ex.") B (same) at 2.  The plaintiff purchased Unit B from the Department of Veterans Affairs in 1998 and Unit A in 2000.  Trial Transcript of January 9, 2012 ("Jan. 9 Trial Tr.") at 13, ECF No. 67.  The plaintiff's initial contact with the defendants occurred in 2000 when the plaintiff acquired a loan from Capital City Mortgage Corporation ("Capital City"), which was secured by a second trust on Unit B, and used by the plaintiff to purchase Unit A from the Department of the Navy Federal Credit Union.[4]

The dispute that brings this case before this Court arose from a second real estate loan obtained from Capital City by the plaintiff on August 6, 2004.  See Pl.'s Ex. D-21 (Deed of Trust); Defs.' Ex. B (same).  This second loan was in the amount of $220,000.00, Pl.'s Ex. D-21 at 1; Defs.' Ex. B at 1, and was used to pay off the two outstanding loans that encumbered the O Street property—$35,430.01 owed to Countrywide Home Loans, Inc. and $23,816.08 owed to Capital City—and settlement expenses related to the acquisition of the loan, Pl.'s Ex. D-16 (Settlement Statement) at 1–2; Defs.' Ex. I (same) at 1–2.  The plaintiff testified that the

---

[3] The plaintiff's proposed findings of fact and conclusions of law included a "Request for Testimonial Impeachment of Defendants Cap[it]al City Mortgage Corp. et al., Alan W. Nash and Nathaniel S. Fulford[,] V" and asked the Court to find that the defendants and defense witness Nathaniel Fulford "committed perjury and their testimony shall be impeached."  Plaintiff's Proposed Findings of Fact and Conclusion[s] of Law ("Pl.'s Proposed Findings") at 99.  In docketing the plaintiff's submissions, the Clerk of Court treated the request as a motion for an order.  See ECF No. 75.  The Court construes the plaintiff's request not as a separate motion, however, but as a proposed finding that the testimony of Alan Nash and Nathaniel Fulford is incredible.  Accordingly, the motion will be terminated without decision as improperly docketed.  In any event, these claims were advanced by the plaintiff during the trial and will be considered in conjunction with the Court's factual findings.

remaining funds were to be used in her attempt to renovate the O Street property, see Pl.'s Exs. E-1, E-2; Defs.' Ex. F at 6.

After receiving a letter from the District of Columbia government ordering her to renovate her O Street property, Jan. 9. Trial Tr. at 16, the plaintiff contacted defendant Alan W. Nash, the president of Capital City, about securing the second loan from Capital City, Trial Transcript of January 11, 2012 ("Jan. 11 Trial Tr.") at 55–56, ECF No. 68, on June 14, 2004, Jan. 9 Trial Tr. at 18.  According to the plaintiff, she told defendant Nash that she needed $385,000.00 to renovate her O Street property, Jan. 9 Trial Tr. at 19, whereas, defendant Nash testified that he "believed" the plaintiff initially requested only $185,000.00, Jan. 11 Trial Tr. at 84.  The parties agreed, however, that ultimately defendant Nash agreed to loan the plaintiff $220,000.00.  Jan. 9 Trial Tr. at 24; Jan. 11 Trial Tr. at 85.  But the plaintiff contends that defendant Nash told her at that time that once the $220,000.00 loan was expended she could apply for another loan to complete the renovations.  Jan. 9. Trial Tr. at 24.

In her credit application for the loan titled "Credit Application for Business, Commercial, or Investment Purposes" dated June 17, 2004, the plaintiff represented that "[t]he purpose of the loan [was] to obtain financing to renovate the property" and to "pa[y] off at settlement" the two existing "first trust balances on [the property]."  Defs.' Ex. F at 5.  The plaintiff also stated on the application that she did not "plan to reside in the . . . property after settlement."  Id. at 6.  This same representation about the intended use of the property was made by the plaintiff when she applied for the first loan she acquired from Capital City in 1999.  Defs.' Ex. O at 4, 5.  And of even greater significance of the plaintiff's intentions, she represented in her 2000 bankruptcy proceedings that the O Street property was "investment property," that she "plan[ned] to fully

---

[4] The plaintiff testified at one point that the initial loan was acquired from Capital City in 2003, Jan. 9 Trial Tr. at 14, but the documentary evidence shows that the transaction occurred on February 4, 2000, Defs.' Ex. C (Deed of Trust) at 1; Defs.' Ex. D (Deed of Trust) at 1.

renovate this property for additional income," and that she anticipated receiving "monthly income" totaling $1,848.00 from the property after the two units were renovated.  Defs.' Ex. T at 3 (Amended Disclosure Statement in Bankruptcy No. 00-0556); see also Jan. 11 Trial Tr. at 71–72 (defendant Nash testified that the plaintiff never told him she intended to reside in the property, and if she had, the loan would not have been approved because Capital City did not make residential loans).  Nonetheless, the plaintiff testified during the trial that she intended to occupy one of the two property units and sell the other unit, and that she told defendant Nash that she intended to live in one of the units.  Jan. 9. Trial Tr. at 21.  Despite the plaintiff's testimony, the Court finds that the documentary evidence undermines the plaintiff's credibility on this point.

The parties were originally scheduled to settle on the second Capital City loan on July 7, 2004, Pl.'s Ex. E-1 at 1, and then on July 29, 2004, Pl.'s Ex. E-2 at 1.  Settlement on the loan, however, did not occur until August 6, 2004.  Defs.' Ex. I at 1.  On both of the two earlier occasions, the plaintiff had a bankruptcy case pending in this Court's Bankruptcy Court that had been filed in 2002, Bankruptcy Case No. 02-01809.  Trial Transcript of January 12, 2012 ("Jan. 12 Trial Tr.") at 6, ECF No. 69; see also Trial Transcript of January 10, 2012, Morning Session ("Jan. 10 Trial Tr. I") at 59.  Defendant Nash contends that the settlement had been delayed because he refused to proceed with the settlement until the bankruptcy case was dismissed.  Jan. 12 Trial Tr. at 5–6.  The plaintiff, on the other hand, denies that her pending bankruptcy case had anything to do with the delay in going to settlement.  Id. at 15; but see Jan. 10 Trial Tr. I at 39 (plaintiff suggests that she did dismiss her bankruptcy case because defendant Nash refused to close on the loan if she did not dismiss the case).  However, the timing of the plaintiff's voluntary dismissal, which was filed on August 5, 2004, Pl.'s Exs. F-1, F-2, one day before the settlement actually occurred, supports defendant Nash's testimony concerning the reason for the dismissal.

According to the plaintiff, she told defendant Nash that the $220,000.00 loan he had agreed to make would be insufficient to fully renovate the property, Jan. 9 Trial Tr. at 24, that "at least, about $385,000" was needed to complete the renovations, Jan. 12 Trial Tr. at 22, and that Nash said "well, once [the plaintiff] d[rew] down and use[d] up the entire 220, that he would make [her] a new loan," id.

Like the 2001 loan, see Defs.' Ex. C at 1; Defs.' Ex. D at 1, the 2004 loan was payable within one year, Defs.' Ex. A at 1; Defs.' Ex. B at 1. Specifically, because the first payment was not due until October 1, 2004, the principal and all accrued interest was due in full on or before September 1, 2005. Defs.' Ex. A at 1; Defs.' Ex. B at 1. The interest payable during the one-year period was 12% per annum, but increased to 24% per annum, at the option of the defendants, in the event payments were not made in accordance with the terms of the note. Defs.' Ex. A at 1, 3. The loan was also an "'interest only' loan," which therefore required that the plaintiff pay only the accrued interest during the one year term of the loan. Id. at 1.

At the settlement on the loan, the parties also entered into a "Construction Draw Agreement," which was "an addendum to the deed of trust note." Defs.' Ex. H. The terms of the agreement provided for an initial draw of $120,000.00. Id. Deducted from the initial draw were payments of the two outstanding loans on the property and the fees associated with the settlement, see Defs.' Ex. I at 1, 2, resulting in the plaintiff's actual receipt at the settlement of only $38,788.64, Defs.' Ex. I (Settlement Statement) at 1; Jan. 9 Trial Tr. at 28–29.

Defendant Nash testified that the funds the plaintiff received at the settlement were "basically[] Ms. Bakeir's first draw on the property," and that "[i]t was money that was supposed to be spent by her to improve the property and probably do the plans, if she hadn't done them already." Jan. 11 Trial Tr. at 66. Despite this testimony, it is not appropriate to characterize the funds the plaintiff received at the settlement as a construction draw, as the Construction Draw

5

Agreement states that such funds were to "be disbursed pursuant to the attached draw schedule," Defs.' Ex. H at 1, and defendant Nash acknowledged that no such schedule accompanied the agreement because the defendants' "draw schedules were put together after closing," Jan. 11 Trial Tr. at 65. According to Nash, construction draw agreements were not prepared before settlement because sometimes, for various reasons, loans are not consummated and so borrowers did not want to pay for the preparation of draw agreements before a loan was finalized. Id. at 65–66. And in the current situation, defendant Nash testified that a construction draw agreement was not prepared prior to the settlement because the plaintiff "did not provide [the defendants] with a set of plans sufficient for building the project." Id. at 65. According to Nash, no such plans were ever provided by the plaintiff. Id. at 68–69. While Ms. Bakeir testified that she gave defendant Nash renovation plans for the property in 2004, she acknowledged that the plans she would have given him were merely drafts that she personally prepared. Jan. 10 Trial Tr. I at 65–66. She further testified that it was probably not until sometime in January or February 2005, id. at 70, when she gave defendant Nash plans prepared by architect William Washington, id. at 93–94; see also id. at 93 (identifying Washington as an architect), id. at 94 (plaintiff's acknowledgement that final plans were not completed until February 2005), or someone retained by Washington, id. at 67–70. Ms. Bakeir also testified that she had the plans that she had given defendant Nash at her home at the time of the trial, id. at 65, but no such plans were ever offered as evidence by her. The Court must therefore side with defendant Nash on the issue of whether he was provided a copy of plans for the O Street property renovations.

There are other points of interest concerning the settlement of the 2004 loan. First, the defendants did not require that an appraisal be conducted prior to approving the loan. Jan. 11 Trial Tr. at 114–15; see also Jan. 9 Trial Tr. at 26. According to defendant Nash, an appraisal was not conducted because an appraisal had been conducted before the 2000 loan was approved,

Jan. 11 Trial Tr. at 58–59, 114–15, and because he relied on the plaintiff's representations

concerning the value of the property, id. at 115–16.  Moreover, although defendant Nash testified

that he drove by the property before the 2004 loan was approved, he admitted that he did not

inspect the interior of the property at that time.  Id. at 123.

Second, defendant Nash testified that he could not recall whether he had acquired the

plaintiff's credit reports, id. at 113, acknowledged that the Housing and Urban Development

("HUD") settlement statement did not reflect that a fee had been charged for a credit report, id.,

and relied on the plaintiff's uncorroborated representations on her loan application as to her

income, id. at 114.  The Court finds that these circumstances establish that a credit report was not

obtained before the parties settled on the 2004 loan.

These seeming irregularities must be viewed through the lens of the parties' level of

sophistication in assessing whether their respective backgrounds impact how the Court should

construe the parties' actions.  On the one hand, defendant Nash testified that he had been

involved in the real estate business for approximately forty-five years, and more specifically had

extensive experience in the construction loan arena.  Id. at 59–60.  On the other hand, Ms. Bakeir

testified that she has worked in the real estate business since 1985.  Jan. 9 Trial Tr. at 58.

Initially, she was a mortgage loan processor, with the responsibility of "gather[ing] all mortgage

documents to make sure that . . . all of the necessary documents are there in order for the

underwriter to . . . approve the loan."  Id.  She then became an underwriter for banks, which

required her, among other things, to evaluate potential borrowers' credit and real estate appraisal

reports.  Id. at 58–59.  The plaintiff also testified that she was a mortgage broker for several

banks and a mortgage loan company, id. at 58, and that she was "fairly active as a mortgage

broker" in 2003 and 2004, Jan. 10 Trial Tr. I at 49.  Moreover, Ms. Bakeir testified that before

she purchased the property that is the subject of this case, she had owned "two or three other

properties" which she had renovated.  Id. at 51–52.  This is therefore a situation involving individuals with extensive real estate and mortgage financing experience, and not a situation in which it can be inferred that one party took advantage of the other party due to a disparity in the parties' experience with and knowledge of the real estate business.

Fundamental to the plaintiff's claims against the defendants is that Capital City was underfunded at the time of the settlement and throughout the term of the loan, and therefore was unable to provide the plaintiff with the funds defendant Nash agreed to loan the plaintiff.  See generally Plaintiff's First Amended Complaint ("Am. Compl."); Jan. 9 Trial Tr. at 4–7 (plaintiff's opening statement).  According to the plaintiff, defendant Nash's objective from the inception was to extract loan payments from the plaintiff based on his false representations that she would receive funding from Capital City to renovate her O Street property and therefore cause the plaintiff to default on the loan, which then permitted the defendants to foreclose on the property due to the plaintiff's inability to repay the loan because she lacked the funds needed to complete the renovations.  See generally Am. Compl.; Jan. 9 Trial Tr. at 4–7 (plaintiff's opening statement).

In support of her position, the plaintiff testified that defendant Nash declined to loan her the amount of funding she told him she needed to renovate the property, and that she nonetheless agreed to accept the loan based on Nash's representation that once she depleted the funds Capital City agreed to place in a construction escrow, she could apply for another Capital City loan to acquire the additional funds needed to complete the renovations.  Jan. 9 Trial Tr. at 19–21, 24.  Despite this purported representation by defendant Nash, the plaintiff emphasized that although Capital City's internet website advertisement stated that Capital City made loans up to $1 million and defendant Nash represented that Capital City could make loans up to that amount, id. at 45; see also id. at 52 (defense counsel's withdrawal of objection to admissibility of website

advertisement), the Capital City bank account she introduced as evidence shows that Capital City had an "ending balance" of $38,640.33 on August 6, 2004, when the parties went to settlement, id. at 54; Pl.'s Ex. B-2 at 3.

The plaintiff testified that defendant Nash told her that after settlement on the loan, Nathaniel Fulford[5] would contact her so they could meet at the property for the purpose of Fulford inspecting the property to ensure that the money she received at the settlement had been used to renovate the property, Jan. 9 Trial Tr. at 27, and prepare a schedule for her to receive periodic disbursements of the loan funds she had acquired from Capital City as work on the O Street property was completed, see id. at 30.  And according to the plaintiff, the initial draw on the loan she was supposed to receive at the settlement was $120,000.00, id. at 27–28, but she received only $38,000.00, id. at 28; see also id. at 29 (stipulation by defendants' attorney that the plaintiff received $38,000.00, and the plaintiff's statement that the amount was actually $38,788.00).[6]

The plaintiff testified that in early September 2004, she received a "stop work order" from the city due to the poor condition of the property.  Id. at 29–30.  According to the plaintiff, she contacted defendant Nash and informed him about the stop work order.  Id. at 30.  She said she told Nash that she had used the money she had received at the settlement and that she needed Fulford to come to the property to verify that she had used the funds in connection with the renovation of the property.  Id.  She testified that Nash gave her Fulford's telephone number, but

[5] The inspector used by Capital City is variously referred to as "Mark Fulford" and "Nathaniel Fulford."  There is no question, however, that the individual referred to as "Mark Fulford" is defense witness Nathaniel Fulford.  The Court will refer to him solely as "Nathaniel Fulford" for ease of reference.

[6] Although the plaintiff testified that the HUD settlement statement "deceptive[ly]" suggested that she would actually receive $120,000.00 as the first draw on the loan, she admitting during cross-examination that the two loans on the property that were outstanding at the time of the settlement were paid from the funds received pursuant to the 2004 loan, and that closing costs were also being deducted from the loan amount, Jan. 10 Trial Tr. I at 78, as indicated on the HUD settlement statement, which she signed, id. at 78–79.

that her efforts to contact Fulford and have him conduct an inspection were fruitless. Id.

Consequently, the plaintiff contends that she contacted Nash several days after she had

previously unsuccessfully attempted to advise Nash of her inability to get the property inspected,

and that Nash eventually contacted her in early October 2004 and told her that Capital City "did

not have any money." Id. at 32. This revelation, the plaintiff testified, "really upset" her, id.,

because her understanding was that $100,000.00 was supposed to be deposited on her behalf in a

construction escrow account, id. at 32–34, 37–38, as reflected on the HUD settlement statement,

Pl.'s Ex. D-16 (Settlement Statement) at line 806.[7]

      To support her testimony that defendant Nash told her that Capital City did not have any

money to provide to her in early October 2004, the plaintiff introduced into evidence a Capital

City bank account statement. Jan. 9 Trial Tr. at 41–44; Pl.'s Ex. B-1 at 2 (showing a balance of

between $53,234.58 to $50,425.12 on October 8, 2004).[8] According to the plaintiff, Nash told

her that he would contact her when the funds were available, but no such contact ever occurred.

Jan. 9 Trial Tr. at 55.[9] The plaintiff's daughter also testified that in November 2004, she went to

Capital City's office on behalf of the plaintiff, who was sick at that time, and was told by

defendant Nash that she should tell her mother that he would call the plaintiff "when we get

money; we don't have any money right now." Trial Transcript of January 10, 2012, Afternoon

Session ("Jan. 10 Trial Tr. II") at 28, ECF No. 66; see also id. at 37. Eventually, the plaintiff

---

[7] The plaintiff states in her proposed findings that "[o]n May 14, 2008, during that meeting [with defendant Nash], is when [she] realized that the $100,000.00 was not available." Pl.'s Proposed Findings at 30. This statement is directly contradicted by the testimony just referenced, however. Accordingly, the Court declines to adopt the plaintiff's finding that she did not realize until May 2008 that no construction escrow account existed as against the weight of the evidence presented at trial.

[8] The exhibit does reflect deposits in excess of $100,000.00 on all dates identified after October 8, 2004.

testified that because the defendants did not provide her any additional funds she had to use her own funds in her attempt to complete the renovations, Jan. 9 Trial Tr. at 55–56, and then had to borrow money from her daughter, id. at 63.

In response to the positions advanced by the plaintiff, defendant Nash testified that when the plaintiff contacted him initially about the 2004 loan she requested only $185,000.00, but later requested $220,000.00, to which he agreed.  Jan. 11 Trial Tr. at 85.  He also denied that he ever had any discussions with the plaintiff about making her another loan, or that the total amount needed to complete all of the renovations would cost $385,000.00.  Jan. 12 Trial Tr. at 45, 47, 52.  In the absence of any corroboration with documentary or any other evidence supporting the plaintiff's claim that defendant Nash agreed to extend further funding to her prior to the settlement, the Court cannot credit the plaintiff's position.

Defendant Nash refuted the plaintiff's claim that Capital City was underfunded when the parties went to settlement.  Jan. 11 Trial Tr. at 69.  According to Nash, Capital City had another bank account from which funding for loans was drawn, in addition to the account about which evidence was presented during the trial by the plaintiff.  Id. at 54; see also id. at 91–92. However, the defendants failed to present any evidence that corroborated this testimony.  Such evidence should have been readily available to the defendants and their failure to present this evidence causes the Court to conclude that a second account from which loan funds could be acquired by Capital City did not exist during the times relevant to this litigation.

Defendant Nash also denied the plaintiff's claim that she requested to receive a draw on the loan at any time prior to May 2005.  Id. at 70–71.  And he noted that the Construction Draw

---

[9] During the plaintiff's cross-examination, defense counsel sought to establish through the plaintiff's answers to interrogatories that defendant Nash did not deny her request for a draw on the loan until late 2006.  Jan. 10 Trial Tr. I at 99–100.  The Court considers this purported distinction to be insignificant, as it discerns no difference between the denial of a request for a draw on the loan and the defendants' purported inability to disburse the funds due to the lack of funds.

Agreement did not require Capital City to make any draws on the loan if not made within nine months after the date of the agreement (August 6, 2004).  Id.; see Defs.' Ex. H at 1.

In addition to testifying that the plaintiff did not request a draw on the loan during the first nine months after the settlement date, defendant Nash testified that the plaintiff was told about how the construction draw process would work.  Jan. 11 Trial Tr. at 57–58.  Specifically, he testified he told her that she would need to provide him with a "set of plans that had been approved by the [D]istrict [of Columbia], [along] with [city issued] permits."  Id.  He then explained that his construction analyst, Nathaniel Fulford, would have to review the plans and permits and "create a draw schedule that would delineate, from the plans, each step of the construction process and affix a dollar amount to it, based on the amount of the money that was going to be available to her to draw on."  Id. at 58.  He further testified that he explained to the plaintiff that periodic inspections would have to be conducted and that funds would be advanced to her based on the "new work" that had been completed.  Id.

The parties also disagree about why the post-settlement construction draw schedule was never prepared.  According to the plaintiff, on July 1, 2004, she was told by defendant Nash that she "would need to get the property inspected before going to settlement by calling [his inspector,] [Nathaniel] Fulford."  Jan. 9 Trial Tr. at 24–25.  And Ms. Bakeir acknowledged that Nash told her that Fulford "would be responsible for preparing a construction draw schedule." Id. at 25.

The plaintiff testified that she contacted Fulford and that he met her at the O Street property in July 2004.  Id.  She said Fulford inspected the property and she explained to him the work she intended to have done.  Id.  She also testified that defendant "Nash was adamant" about the property being "inspected before going to settlement."  Id. at 26.  Moreover, Ms. Bakeir testified that Nash told her that she would have to contact Fulford following the settlement to

have the construction draw schedule prepared and for Fulford to again "inspect the property[] to make sure that [she] applied the monies that [were] give[n] to [her] at the . . . settlement" to renovate the property, id. at 26–27, before she could obtain another draw on the loan, id. at 27.

As noted earlier, the plaintiff testified that she used the money she received at the settlement in her effort to renovate the property. Id. at 28. After using those funds and receiving the stop work order from the city which was discussed earlier, the plaintiff testified that she contacted defendant Nash, told him about the stop work order, and advised him that she would be calling Fulford to come to the property again to conduct another inspection to confirm that she had used the funds received at the settlement for work done at the property. Id. at 30.

According to the plaintiff, she unsuccessfully attempted to contact Fulford on several occasions during the first week of October 2004. Id. She also testified that Fulford never returned her telephone calls. Id. Unable to make contact with Fulford, Ms. Bakeir testified that on October 8, 2004, she went to defendant Nash's office and because Nash was not present she asked his receptionist to tell him to call her concerning her "difficulty getting [Fulford] to go . . . and inspect the property." Id. at 30–32. The plaintiff testified that it was three to four days later when defendant Nash called her and stated that he did not have any money available to give her. Id. at 32. Unable to ever make further contact with Fulford, Jan. 10 Trial Tr. I at 75, a construction draw schedule was never completed, see id. at 81–82.

Nathaniel Fulford testified that he met the plaintiff at the O Street property on one occasion at defendant Nash's instructions. Jan. 10 Trial Tr. II at 54. Although Fulford was uncertain of the exact date of the meeting, he testified that he remembered that it occurred in 2004 in "the latter part of the summer" because "[i]t was still warm outside," and that it occurred "in the latter part of August or [the] beginning of September, to the best of [his] recollection." Id. at 60. According to Fulford, he went to the property to "get a set of plans, do a draw

schedule, and ascertain the amount of work that had been performed to date." Id. at 54.  Fulford

testified that he informed the plaintiff that he "needed a set of plans" because he "needed to

understand the scope of the work," and she told him that "[s]he would get [him] a set of plans."

Id.

      Fulford indicated that the type of plans he needed from the plaintiff to prepare a draw

schedule were "plans to show exactly what's being done at the job site." Id. at 55.  Such plans

he testified would include "framing, . . . electrical, . . . mechanicals, . . . [and] plumbing plans" so

that he could "cost out whatever the money is that's going to do the job site." Id.; see also id. at

63–65 (further describing the plans needed).  Fulford further testified that the plans "have to be

approved by the District of Columbia," and that no such plans were ever provided to him by the

plaintiff.  Id. at 56.

      Fulford also testified that he saw permits at the property, but that they were not permits

"for the work that was actually being performed." Id. at 56.  According to Fulford, the permits

the plaintiff had acquired were what he classified as "rehab permits," id., or "the type of

permit[s]" needed to perform "cosmetic[]" work, id. at 57.  These permits, Fulford testified, were

not appropriate for the work that was being performed and that would be needed to renovate the

property.  He testified that the property "was being gutted," with the "floor joists, . . . the

mechanicals, . . . [and] the electrical" components of the building having been "removed." Id.

He further testified that "the grade of the ground was cut below the footing elevation."  Id.

      Fulford testified that after meeting the plaintiff at the property, he "never heard from her

after that[,] she never called me back." Id. at 62; see also id. at 63.  He also testified that if the

plaintiff had called him that he would have "responded" to her call.  Id. at 63.

      Although the plaintiff introduced as evidence fourteen permits she had acquired from the

District of Columbia government for the O Street property, they do not encompass the scope of

the work needed and are not sufficient to perform the work the plaintiff testified she intended to perform.  See Pl.'s Exs. J-1 to J-15.  The Court must therefore conclude that the plaintiff never acquired the permits she needed to fully renovate the O Street property.

As noted earlier, the loan that is the subject of this litigation was a one year loan, with a maturity or expiration date of September 1, 2005.  See Defs.' Ex. A at 1; Defs.' Ex. B at 1.  In response to questioning by defense counsel regarding whether she believed that the defendants had breached the parties' agreement by the time the loan matured, the plaintiff testified "[a]ll I know is that they didn't comply with their own documents as far as making the disbursement." Jan. 10 Trial Tr. I at 83.  The plaintiff also testified that between December 2004 and February 2005, she knew "that [Nash] was not complying with his own documents" but was not sure if she would have used the word "breach" because "at the time, I wasn't sure because I didn't have . . . evidence to substantiate that."  Id. at 91–92.  She assented to the accuracy of her statement in her complaint that "[s]he explained [to the District of Columbia] that Capital City has failed to disburse funds in order to resume the renovation."  Id. at 92–93.  The Court finds that the plaintiff's testimony establishes that by March 2005, she believed that Capital City had breached its agreement with her.

There is no dispute that the loan was not repaid by the plaintiff in full on the maturity date as agreed to by the parties.  Jan. 9 Trial Tr. at 76; Jan. 11 Trial Tr. at 77.  It is also not disputed that the defendants did not seek to foreclose on the property when the loan was not repaid on the maturity date.  Id. at 74; see Jan. 9 Trial Tr. at 73.  There is also no dispute that the plaintiff did not acquire insurance for the property as required by the loan agreement.  Id. at 56; Jan. 11 Trial Tr. at 77.  The parties disagree as to whether the plaintiff failed to make payments on the loan as required by the parties' agreement.  Id. at 77, 169; see Jan. 9 Trial Tr. at 73. However, it is agreed that at least some payments were made by the plaintiff after the maturity

date and that foreclosure proceedings were not initiated by the defendants until March 10, 2008. Id. at 72–73; Jan. 11 Trial Tr. at 74, 77.

## II. CONCLUSIONS OF LAW

### A.  The Plaintiff's District of Columbia Consumer Protections Act Claim

The District of Columbia Consumer Protections Act "affords a panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices."  Ford v. Chartone, Inc., 908 A.2d 72, 80–81 (D.C. 2006) (quoting Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 717 (D.C. 2003)).  The Consumer Protections Act defines a "consumer" as "a person who does or would purchase, lease (from), or receive consumer goods or services . . . or a person who does or would provide the economic demand for a trade practice" and further specifies that "as an adjective, 'consumer' describes anything, without exception, which is primarily for personal, household, or family use."  D.C. Code § 28-3901(a)(2) (2012).  The Consumer Protections Act, accordingly, does not apply to transactions of a commercial nature.  Ford, 908 A.2d at 81; Adam A. Wechsler & Son, Inc. v. Klank, 561 A.2d 1003, 1005 (D.C. 1989) (stating that "[t]ransactions along the distribution chain that do not involve the ultimate retail customer are not 'consumer transactions' that the Act seeks to reach").  For example, in Mazanderan v. Independent Taxi Owners' Ass'n, a former member of this Court held that a taxi driver's purchase of gasoline and supplies did not fall within the Consumer Protections Act because the purchases "are made in connection with his role as an independent businessman" and therefore "cannot be categorized as being for 'personal, household, or family use'" as required under the Act.  700 F. Supp. 588, 591 (D.D.C. 1988). Similarly, in Poblete v. Indymac Bank, another former member of this Court noted that the Consumer Protections Act's definition of consumer excludes properties purchased for investment purposes only.  657 F. Supp. 2d 86, 95 (D.D.C. 2009).

Based on the evidence presented during the trial, it is clear that the plaintiff's transaction with the defendants does not fall within the purview of the Consumer Protections Act in light of the Court's finding that she purchased the property for investment purposes.  As in <u>Mazanderan</u>, the plaintiff entered into the transaction at issue in her role as a real estate investor, and therefore her transaction cannot be fairly classified as for "personal, household, or family use" as required to claim the protections afforded under the statute.  Accordingly, the Court finds in favor of the defendants on the plaintiff's claim under the Consumer Protections Act.

**B.  The Plaintiff's Usury Law Claim**

The plaintiff's claim for violation of D.C. Code § 28-3312, which prohibits material misrepresentations by lenders, must fail for the same reason.  Pursuant to D.C. Code § 28-3301, the District of Columbia's usury laws apply to "consumer credit transactions," which occur when "[a] written agreement evidencing the obligation or offer of the consumer is received by the creditor in the District of Columbia" or "[a] consumer who is a resident of the District of Columbia enters into the transaction with a creditor who has solicited or advertised in the District of Columbia by any means . . . . "  D.C. Code § 28-3301(h).  As used in the chapter concerning usury and interest rates, "consumer" is defined with reference to the definition of "consumer" used in the Consumer Protections Act, D.C. Code § 28-3301(i), which, as noted above, is limited to things which are "primarily for personal, household, or family use," D.C. Code § 28-3901(a)(2).  As discussed above, the Court finds that the plaintiff purchased the O Street property for investment purposes, and therefore her transaction cannot be characterized as a "consumer credit transaction" because it was not "primarily for personal, household, or family use."  Accordingly, the Court finds in favor of the defendants on the plaintiff's claim for violation of D.C. Code § 28-3312.

17

### C.  The Plaintiff's Fraud Claim and Fraud Related Claims

The defendants argue that, as an initial matter, the plaintiff's fraud and fraudulent inducement claims are barred by the applicable statute of limitations.  See Defendants' Proposed Findings of Fact and Conclusions of Law ("Def.'s Proposed Findings") at 17–19; see also Answer to First Amended Complaint ("Answer") at 2 (asserting statute of limitations defense as to all of the plaintiff's claims).  Under District of Columbia law, fraud claims[10] are subject to a three-year statute of limitations.  See D.C. Code § 12-301 (2013) (providing for three-year statute of limitations for any cause of action "for which a limitation is not otherwise specially prescribed"); see also King v. Kitchen Magic, Inc., 391 A.2d 1184, 1186 (D.C. 1978) (holding that fraud claim must be brought "within three years from the time the fraud either is discovered or reasonably should have been discovered").  The statute of limitations begins to run when a plaintiff knows or reasonably should know of "(1) the existence of the alleged injury, (2) its cause in fact, and (3) some evidence of wrongdoing."  Drake v. McNair, 993 A.2d 607, 617 (D.C. 2010).  With respect to a plaintiff's actual knowledge, "it is well established that 'general knowledge that [a defendant's conduct] was wrongful,' rather than knowledge of the 'precise legal remedies for [that wrongful conduct],' is the focus of this discovery rule."  Id. at 617–18 (quoting East v. Graphic Arts Indus. Joint Pension Trust, 718 A.2d 153, 157 (D.C.1998)) (alterations in original).  In cases of inquiry notice, the relevant determination is "whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to [her]."  Id. at 617 (citation and quotation marks omitted).  "[S]uspicions" that something is amiss "place[] upon [a plaintiff] the obligation to move

---

[10] The relevant case law makes no distinction between the claims of fraud and fraudulent inducement in determining whether the claim is barred by the applicable statute of limitations.  See, e.g., Drake v. McNair, 993 A.2d 607, 617–621 (D.C. 2010) (discussing statute of limitations in fraud cases generally in determining whether statute of limitations barred fraudulent inducement claim).

promptly and with reasonable diligence to inquire further into the matter." In re Estate of Delaney, 819 A.2d 968, 982 (D.C. 2003).

Here, the plaintiff filed her complaint on October 14, 2008, and amended it to include claims of fraud and fraudulent inducement on October 23, 2009.  Unfortunately for the plaintiff, the testimony necessary to establish her fraud claim also shows that the plaintiff had actual knowledge of the defendants' fraudulent conduct beginning in October 2004, leading to the conclusion that her claim is time-barred.  At trial, the plaintiff sought to prove that Capital City never intended to perform its obligations under the agreement executed by the parties by showing that Capital City lacked sufficient funds to issue disbursements to her and deliberately obstructed her efforts to obtain draws on her loan in the hope that she would eventually default on her note so that it could obtain her property through foreclosure.  See Jan. 9 Trial Tr. at 4–7. The plaintiff testified that defendant Nash told her that $100,000.00 would be placed in an escrow account, with draws available on request and completion of an inspection of work done with previously-disbursed loan funds.  Id. at 54–55; see also Pl.'s Ex. D-16 at 2 (Settlement Statement); Def.'s Ex. I at 2 (same).  According to the plaintiff's testimony, at defendant Nash's instruction, she contacted Nathaniel Fulford repeatedly to arrange for an inspection of the property in order to obtain a draw on the property, but Fulford did not return any of her calls. Jan. 9 Trial Tr. at 30–31.  The plaintiff indicated that in October 2004, she spoke with defendant Nash regarding a draw on her loan and was informed by him that Capital City was unable to disburse the requested funds because Capital City "did not have any money."  Id. at 32.  She testified that she realized that a construction escrow account did not exist, even though she had already paid fees on the $100,000.00 that she contended was to have been placed in the escrow account.  Id. at 38–40.  The plaintiff also elicited testimony from her daughter, Melissa Barnette, who said that defendant Nash similarly told her in November 2004 that Capital City could not

19

disburse funds to the plaintiff because it did not have sufficient money to do so.  Jan. 10 Trial Tr. II at 28.  To support this testimony, the plaintiff presented bank records to show that Capital City did not have sufficient deposits to fund her loan on the day of settlement, in early October 2004 when she spoke to defendant Nash regarding a draw, see Pl.'s Ex. B-1 (Capital City bank statement for October 2004), or in November 2004 when her daughter spoke to defendant Nash regarding a draw, see Pl.'s Ex. B-4 (Capital City bank statement for November 2004).

If the Court credits the plaintiff's testimony as described above, however, it is apparent that the plaintiff knew of the defendants' fraudulent conduct and her alleged injury by the end of November 2004.  The plaintiff also had knowledge of the purported wrongdoing from defendant Nash's statements to her and Ms. Barnette regarding Capital City's lack of funds.  At the very least, the discussion about receiving a draw on the plaintiff's loan would have aroused suspicions that placed her on inquiry notice of the alleged fraudulent conduct.  The plaintiff filed her complaint on October 14, 2008, just over four years after the incident in October 2004, during which the plaintiff learned that Capital City lacked sufficient funds to disburse loan proceeds to her and that the construction escrow account central to her fraud and breach of contract claims did not exist.  The plaintiff thus filed her fraud claim more than three years after her cause of action accrued.

In her reply to the defendants' proposed findings of fact and conclusions of law, the plaintiff argues that she amended her complaint to add the claims at issue when she "discover[ed] that the [d]efendants . . . had intentionally committed predatory lending fraud" upon the receipt of early discovery from the defendants.  Pl.'s Reply at 27–32.  At trial, the plaintiff testified that she "didn't know that it was fraud until after receiving the bank statements," Jan. 10 Trial Tr. I at 83, which she testified that she received in April 2010, id. at 88.  This argument is unavailing.  As described above, the plaintiff had notice of the facts

underlying her fraud claim and evidence of the defendants' wrongdoing in the fall of 2004, and

thus her claim accrued at that time.  An interpretation of the discovery rule that permitted the

start of the limitations period to be delayed until a plaintiff received discovery that conclusively

proved her claim would eviscerate the statute of limitations.  See Cormier v. Dist. of Columbia

Water & Sewer Auth., 959 A.2d 658, 669–70 (D.C. 2008) (rejecting argument that statute of

limitations did not begin to run until the plaintiff received an expert opinion that injury was

caused by defendant's conduct because "a plaintiff could defer the running of the statute by

simply failing to consult an expert").  Moreover, the plaintiff's own action in amending her

complaint in October 2009 to include a fraud claim based on the allegation that Capital City was

underfunded undermines her argument that she did not discover her cause of action until she

received Capital City's bank statements in 2010.

      In response to the defendants' argument that her claims are time-barred, the plaintiff also

points out that Capital City "continue[d] to [accept] interest payments from [her] in the year

2008 by force of threat to foreclose on the [p]roperty."  Pl.'s Reply at 28.  During trial, the

plaintiff also testified that defendant Nash repeatedly assured her that he would provide her with

additional renovation funds.  See Jan. 9 Trial Tr. at 82 (stating that Nash would refer her to

various individuals to give her an estimate); id. at 97–98 (stating that Nash told her that he would

disburse funds to her if she agreed that she owed 24% interest on her outstanding loan); Jan. 10

Trial Tr. I at 84 (stating that "[Nash] kept promising me that he was going to, basically,

disburse").  The Court construes the plaintiff's response as an argument that the so-called

"lulling doctrine" applies.[11]  Under the lulling doctrine, a defendant is estopped from asserting a

statute of limitations defense because his affirmative conduct has lulled a plaintiff into inaction,

---

[11] Because the plaintiff is proceeding pro se, the Court must construe her arguments liberally.  See Richardson v. United States, 193 F.3d 545, 548 (D.C. Cir. 1999) (citation omitted).

causing her to file her claim beyond the limitations period based on her reliance on the defendant's conduct. <u>East</u>, 718 A.2d at 156–57. A plaintiff may invoke the doctrine based on actions such as assurances that the defendant will begin or resume performing its obligations under an agreement. <u>See</u> <u>Prof'l Answering Serv., Inc. v. Chesapeake & Potomac Tel. Co.</u>, 565 A.2d 55, 67 (D.C. 1989).

The lulling doctrine is inapplicable under the circumstances of this case. The mere act of continuing to accept payments on a loan that was not paid in full upon maturity is not affirmative conduct that conceals the facts relevant to the plaintiff's claim or forestalls her from filing of a claim. Furthermore, the plaintiff also testified that defendant Nash repeatedly ignored or denied her requests for a disbursement of loan proceeds throughout the loan period and thereafter. Jan. 9 Trial Tr. at 80 (plaintiff testified that Nash would not respond when she sent him estimates for renovation work that still needed to be completed); Jan. 11 Trial Tr. at 220–24 (questioning Nash on statements he allegedly made to the plaintiff that she characterized as "other excuses why [Nash] did not disburse" to her as set forth in amended complaint). The defendants' conduct, when considered in its entirety, cannot be fairly characterized as seeking to conceal fraudulent behavior or inducing the plaintiff's inaction based on assurances that the defendants would remedy the problem. To the contrary, if the Court credits the plaintiff's testimony, it would have been apparent within the limitations period that the defendants would not disburse loan funds to her despite statements to the contrary based on the pattern of conduct alleged by the plaintiff.

The plaintiff is also unable to rely on the continuing tort doctrine to avoid the statute of limitations bar. In order to establish a "continuing tort," a plaintiff must show "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period." <u>Beard v. Edmondson & Gallagher</u>, 790 A.2d 541, 547–48 (D.C. 2002) (citation omitted) (alteration in

original).  The fraudulent conduct alleged by the plaintiff, however, is that defendant Nash

misrepresented his intent to perform Capital City's obligations under the contract.  See Am.

Compl. ¶¶ 213–16.  Since the note matured on September 1, 2005, more than three years before

the plaintiff filed her claim, the alleged conduct necessarily does not include actions taken within

the limitations period.  The continuing tort doctrine thus is of no assistance to the plaintiff.

Accordingly, the Court must conclude that the plaintiff's claims of fraud and fraudulent

inducement are barred by the statute of limitations.

Moreover, even if the plaintiff's claim were not time-barred, the evidence adduced at trial

is insufficient to support a fraud claim.  In order to prevail on a fraud claim, a plaintiff must

prove by clear and convincing evidence that the defendant made "(1) a false representation (2) in

reference to [a] material fact, (3) made with knowledge of its falsity, (4) with the intent to

deceive, and (5) action is taken in reliance upon the representation."  Va. Acad. of Clinical

Psychologists v. Grp. Hospitalization & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005)

(citation omitted).  A traditional fraud claim is based on an intentional misrepresentation, and in

the context of the formation of a contract, is characterized as fraud in the inducement.  Hercules

& Co., Ltd. v. Shama Rest. Corp., 613 A.2d 916, 923 (D.C. 1992).  A plaintiff can also bring a

fraud claim based on the defendant's breach of a contract between the parties if she can prove

that at the time the parties entered into the contract, the defendant "had no present intention of

carrying it out."  Va. Acad. of Clinical Psychologists, 878 A.2d at 1234.  The claim must be

premised on the defendant's misrepresentation of "his present intent to perform an act in the

future," not "an erroneous forecast of an event's future occurrence."  Chedick v. Nash, 151 F.3d

1077, 1081 (D.C. Cir. 1998) (emphasis in original); see Bennett v. Kiggins, 377 A.2d 57, 60–61

(D.C. 1977).  If the fraud claim involves a commercial contract negotiated at arm's length, the

plaintiff must also prove that her reliance on the representation was reasonable.  Drake, 993 A.2d

at 622, 625 (extending this requirement beyond corporate litigants to plaintiff negotiating

settlement agreement).  Reliance is unreasonable when a plaintiff fails to investigate her

suspicions about the veracity of the defendant's representations before entering an agreement.

Id. at 624–25.

It is this final element that proves fatal to the plaintiff's claims here.  Even if the Court

were to credit the plaintiff's testimony in its entirety, the plaintiff has not presented sufficient

evidence showing that her reliance on the defendant's representations was reasonable.  As noted

earlier, there were numerous peculiarities in the loan application process and in the settlement of

the loan.  First, Capital City did not require an appraisal of the plaintiff's property before

approving a $220,000.00 loan secured by the O Street property, relying instead on an appraisal

conducted four years earlier and on the plaintiff's representations concerning the value of the

property.  Jan. 11 Trial Tr. at 114–16; see also Jan. 9 Trial Tr. at 26.  Second, Capital City did

not acquire the plaintiff's credit reports at any time during the loan application process.  See Jan.

11 Trial Tr. at 113.  Third, Capital City did not request any verification of income or assets from

the plaintiff, and relied wholly on the plaintiff's representations as to her income.  See id. at 114;

Jan. 9 Trial Tr. at 66–67.  These actions were taken with the knowledge that the plaintiff had a

pending bankruptcy petition when she applied for financing with Capital City.  See Jan. 12 Trial

Tr. at 5–6 (defendant Nash's testimony that dismissal of the plaintiff's bankruptcy petition was a

condition to closing on her loan with Capital City).  Fourth, the plaintiff testified that defendant

Nash told her that she didn't need to acquire insurance on the property securing the loan.  Jan. 9

Trial Tr. at 57, 60–61.

These irregularities should have, and in fact, did, alert the plaintiff to the possibility that

the defendants were not entering into the transaction in good faith.  At the time of the disputed

transaction, the plaintiff had nearly twenty years of experience in the real estate business,

24

specializing in mortgages, Jan. 9 Trial Tr. at 58–59, and had previously purchased and renovated "two or three other properties" for investment purposes, Jan. 10 Trial Tr. I at 51–52.  The plaintiff testified that in her experience,[12] a lender generally obtains an appraisal of the property before settlement.  Jan. 9 Trial Tr. at 26.  The plaintiff indicated that she expected Capital City to verify her income and assets and implied that it was unusual that it did not request documentation supporting the representations she made in her loan application.  Id. at 65–66.  The plaintiff testified that to her knowledge, a borrower is generally required to obtain insurance on the property securing the note before settlement.  Id. at 60.  Finally, the plaintiff testified that she actually questioned defendant Nash before settlement regarding the lender's fees reflected on the HUD settlement statement because she believed it to be illegal to collect fees based on the entire amount of the loan even though only a portion of the loan would be disbursed at settlement.  See Jan. 12 Trial Tr. at 33–34, 36 (testifying that "upon reviewing" the HUD settlement statement, she contacted defendant Nash and "told him . . . you know you're not supposed to be collecting the eight percent off of the $100,000 since you['re] not disbursing that money to me [at settlement]").  Perhaps most importantly, the plaintiff now relies on these very indicators to establish her fraud claim, arguing, in part, that it is "factually evident" that Capital City was not "operating as a legitimate mortgage company" based on the "defendants' intentional failure to acquire the customary lending documents (i.e., real property appraisal report, verification of income, credit report, inspection reports, verification of income, construction draw schedule, interior and exterior photographs of the [p]roperty, and the like)." Pl.'s Proposed Findings at 80.

---

[12] The plaintiff did not testify as an expert witness, but the Court ruled that it was permissible for the plaintiff to testify concerning her prior experience regarding other real estate transactions.  Jan. 9 Trial Tr. at 59.

In light of this evidence, the plaintiff cannot claim that she reasonably relied on the defendants' representation that Capital City was entering into the transaction in good faith and intended to fully perform its obligations.  The plaintiff testified at trial that she recognized that the defendants' conduct before settlement deviated from what, in her experience, was normal practice in the real estate industry.  If she had suspicions, she was not permitted to "close [her] eyes and blindly rely upon the assurances of another" in entering into the agreement with Capital City.  Drake, 993 A.2d at 624–25 (citation omitted).  Furthermore, she now relies on these very circumstances as proof that the defendants engaged in fraud.  If, as the plaintiff argues, the irregularities of the transaction make it "evident" that Capital City was not "operating as a legitimate mortgage company," the plaintiff's reliance cannot be considered reasonable.  See Pl.'s Proposed Findings at 80.  The Court thus finds in favor of the defendants on the plaintiff's claims of fraud and fraudulent inducement.

The Court's disposition of the fraud and fraudulent inducement claims requires it to conclude that the plaintiff's claims of civil conspiracy and unjust enrichment must also fail. Under District of Columbia law, a cause of action for civil conspiracy is not actionable as an independent cause of action, but rather is "a means for establishing vicarious liability for the underlying tort." Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 738 (D.C. 2000) (citation omitted).  Having failed to prevail on her underlying fraud claim, the plaintiff's civil conspiracy claim cannot be maintained.  Id.  The plaintiff's claim of unjust enrichment is similarly predicated on the success of her fraudulent inducement claim.  A plaintiff cannot maintain a claim for unjust enrichment if a valid contract exists between the parties.  Harrington v. Trotman, 983 A.2d 342, 346–47 (D.C. 2009).  Because the Court finds that the contract between the parties is not void due to fraud, the Court must find in favor of the defendants on the plaintiff's claim of unjust enrichment.

26

**D.  The Plaintiff's Breach of Contract Claim**

The defendants contend that the plaintiff's breach of contract claim is similarly time-barred.  Def.'s Proposed Findings at 14–15; see also Answer at 2 (asserting statute of limitations defense as to all of the plaintiff's claims).  Claims for breach of contract are also subject to a three-year statute of limitations.  D.C. Code § 12-301.  The limitations period begins to run at the time of the defendant's breach.  Murray v. Wells Fargo Home Mortg., 953 A.2d 308, 319–20 (D.C. 2008) (citation omitted).  Like fraud, the statute of limitations for a claim for breach of contract may be tolled pursuant to the "discovery rule" so that the limitations period does not begin to run until a plaintiff has actual or inquiry notice of her cause of action.  Harris v. Ladner, 828 A.2d 203, 205–06 (D.C. 2003).

The evidence adduced at trial demonstrates that the plaintiff's claim for breach of contract is time-barred.  As discussed earlier, according to the plaintiff's testimony, she was first denied a disbursement of loan proceeds in October 2004, when defendant Nash told her that Capital City did not have sufficient funds to make a disbursement.  Jan. 9 Trial Tr. at 37–38, 54–55.  During trial, the plaintiff admitted twice that she believed that Capital City had already breached its agreement with her by the time the loan matured.  Jan. 10 Trial Tr. I at 83, 91–92.  The plaintiff's testimony plainly establishes that the facts underlying her claim for breach of contract had occurred as early as October 2004.  As discussed earlier, the Court finds that the plaintiff believed that Capital City had breached the agreement by at least March 2005.  The plaintiff's claim for breach of contract had thus certainly accrued by the time the loan matured on September 1, 2005.  The plaintiff's claim for breach of contract, which was filed on October 18, 2008, more than three years after the maturation of the note, is therefore barred by the statute of limitations.  Accordingly, the Court finds in favor of the defendants on the plaintiff's breach of contract claim.

**E.  The Plaintiff's Claim for Intentional Infliction of Emotional Distress**

In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  Kitt v. Capital Concerts, Inc., 742 A.2d 856, 861 (D.C. 1999) (citations and quotation marks omitted).  Conduct is actionable under this theory of liability only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Wood v. Neuman, 979 A.2d 64, 77 (D.C. 2009) (citation and quotation marks omitted).  A plaintiff must show that the defendant harbored "an intent . . . to cause a disturbance in [the plaintiff's] emotional tranquility so acute that harmful physical consequences might result."  Id. (citation and quotation marks omitted).  Experiencing general unhappiness and embarrassment does not constitute the "severe emotional distress" required to recover for intentional infliction of emotional distress.  Id. at 78 (holding that evidence that the plaintiff "was 'horrified' at [the defendant's] destruction of her garden, was constantly crying and almost sleepless, was shaken at her arrest, and was embarrassed at having been made out to be a 'pariah' in the neighborhood" was not sufficient to support claim of intentional infliction of emotional distress).

Even if the Court were to credit her testimony in its entirety, the plaintiff failed to introduce sufficient evidence at trial to sustain a claim of intentional infliction of emotional distress against the defendants.  The plaintiff presented evidence regarding the emotional impact of the defendants' actions upon her through her own testimony and that of her daughter.  The plaintiff testified that she was "really upset" upon learning that Capital City did not have sufficient funds to disburse to her, Jan. 9 Trial Tr. at 32, that she experienced financial difficulty, particularly in paying for her son's education, id. at 77, 67–68, and that her daughter "saw that it

was making [her] ill," id. at 77.  Ms. Barnett, the plaintiff's daughter, testified that the plaintiff was "troubled and dismayed" at her experiences with Capital City, Jan. 10 Trial Tr. II at 27, 29–30, and that the plaintiff's financial difficulties required her to provide financial assistance to her mother, id. at 30–31.  Although the plaintiff indicated that she was ill in late 2004, Jan. 9 Trial Tr. at 69, the plaintiff did not present any evidence at trial other than her brief statement that her daughter "saw that it was making [her] ill," id. at 77, showing that her medical issues were caused or exacerbated by the defendants' alleged conduct, see Jan. 10 Trial Tr. I at 91 (stating that she was hospitalized in late 2004 but declining to disclose the nature of her illness).  Even assuming that the defendant's conduct was sufficiently "extreme and outrageous" to satisfy the first element of the claim, the plaintiff's evidence shows only that the plaintiff experienced general distress, embarrassment, and unhappiness.  The plaintiff did not present evidence that she suffered emotional distress "so acute that harmful physical consequences might result," and therefore, the Court finds in favor of the defendants on the plaintiff's final claim.

### III. CONCLUSION

For the reasons set forth above, the Court finds in favor of the defendants on all remaining claims in the plaintiff's First Amended Complaint.

**SO ORDERED** this 4th day of March, 2013.[13]

REGGIE B. WALTON
United States District Judge

---

[13] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.